St. Julian *v.* Owens-Illinois, Inc.

(No. 76-2009—Decided September 29, 1978.)

Court of Common Pleas of Lucas County.

*Messrs. Green, Lackey & Nusbaum* and *Mr. John A. Harris III*, for plaintiff.
*Messrs. Shumaker, Loop & Kendrick, Mr. Robert G. Clayton, Jr.,* and *Mr. David W. Wicklund*, for defendant.

GLASSER, J. The motion of the defendant Owens-Illinois, Inc. (hereinafter cited as O-I) for summary judgment was submitted to the court on the pleadings, memoranda and affidavits. Oral arguments were waived.

This cause originated as an action for personal injuries brought by plaintiff on the claim that he contracted and became infected with lead poisoning as a result of unlawful and negligent conduct by the defendant. Specifically, plaintiff alleges that he sustained injuries from exposure to solder glass dust while disassembling and moving equipment owned by defendant. At the time of the alleged incident, plaintiff was an employee of Auburndale Trucking Company (hereinafter cited as Auburndale), which had been employed as a subcontractor to disassemble and to move the equipment.

Defendant, in moving for summary judgment, maintains that, as the owner of the premises where the injury allegedly occurred, it owned no duty to protect the safety of plaintiff St. Julian; rather, defendant claims, this duty was upon the subcontractor Auburndale because the subcontractor was aware of the dangers or hazards involved in the work which it contracted to perform. Thus, defendant argues that there is no genuine issue of material fact and that, as a matter of law, judgment must be rendered in its favor. In opposition, plaintiff claims that the facts of this case support three alternative bases of liability: "abnormally or unreasonably dangerous activities or product"; "the defendant's own negligence"; and "violation of statute or safety regulations."

In determining whether defendant is entitled to judgment as a matter of law, this court must, of course, construe all evidence presented in the light most favorable to plaintiff. At the outset, a few significant and undisputed facts must be noted. First, the hazard giving rise to this controversy is solder glass dust. Second, regardless of the source or origin of this dust, the parties concede that exposure to solder glass dust was a possible hazard in the performance of the contract, namely the disassembling and moving of defendant's equipment. Third, there is no question that plaintiff's employer knew of the hazard involved in the work it contracted to perform. Not only did Auburndale perform this identical work in the past but, in addition, it informed its employees that various safety measures must be followed to avoid exposure to this hazard. While plaintiff denies that he was aware of the severe health hazard inherent in solder glass dust, he does not dispute defendant's claim that plaintiff's employer knew of the hazard and that plaintiff, as an employee of Auburndale, was advised to follow safety precautions. To the contrary, plaintiff states in his affidavit that he "requested on numerous occasions, through (his) representative, that Owens-Illinois allow him to wash down the equipment prior to commencing the (required work). Owens-Illinois refused to allow us to wash down the equipment before [working]." Fourth, plaintiff's

employer was contractually bound to assume the responsibility for the safety and welfare of its employees.[1]

Plaintiff's first theory by which he seeks to impose liability on defendant is based on "strict liability for extra hazardous or ultra-hazardous activities." Under this approach, plaintiff relies on the Restatement of Torts 2d, Section 427A, to impose upon defendant a "non-delegable responsibility for harm" to an independent contractor caused by work "involv[ing] an abnormally dangerous activity." In particular, plaintiff cites the following section:

"One who employs an independent contractor to do work which the employer knows or has reason to know to involve an abormally dangerous activity, is subject to liability to the same extent as the contractor for physical harm to others caused by the activity."

By its very language, this section imposes liability upon an owner for injury *to others, i. e.,* to third persons, where that injury in caused by an independent contractor; plaintiff, however, endeavors to interpret this section as imposing liability on the owner for injury to employees of an independent contractor.

As further authority for its proposition, plaintiff relies on the products liability case of *Borel* v. *Fibreboard Paper Products Corp.* (C. A. 5, 1973), 394 F. 2d 1076, certiorari denied, 419 U. S. 869, 95 S. Ct. 127, 42 L. Ed. 2d 107 (1974).[2] There, however, the plaintiff was able to show

---

[1] The relevant portion of the contract between the contractor, Lathrop, and the defendant, Special Conditions, at .10-6, incorporated by reference into Auburndale's subcontract with Lathrop, reads as follows:

"*Safe Conduct of the Work* A. The Contractor shall be responsible for the safe conduct of the work and the safety and welfare of his employees. B. Contractor shall furnish masks, respirators, or other necessary protection from dust, for the use of his employees working in or around the former batch area. Contractor shall be responsible for requiring the use of the above by his employees. C. The contractor shall comply with all applicable local, State and Federal laws governing the conduct of the work. Particular attention is directed to the Occupational Safety and Health Act of 1970, including Part 1926."

[2] In *Borel*, the plaintiff was an industrial insulation worker who regularly handled asbestos. 493 F. 2d at 1081. When the plaintiff

its status as a user or consumer of manufactured goods. Plaintiff's reliance on *Borel*, therefore, ignores this essential relationship between the parties—user or consumer versus manufacturer—and plaintiff has failed to present facts which would support his attempt to characterize the case at bar as one involving products liability.

Within his argument for strict liability, plaintiff also claims that the defendant is liable because it failed to provide plaintiff with adequate warnings of foreseeable dangers. Plaintiff does not consider this "duty to warn" under a negligence theory of "duty and alleged breach of duty," but states instead that only "an adequate warning to the plaintiff himself of the specific gravity of harm" would relieve defendant of liability under the products liability theory followed in *Borel*. Once again, the court finds unavailing plaintiff's efforts to characterize the case at hand as one involving products liability.

Plaintiff also urges this court to find that the defendant had a non-delegable duty to take special precautions to protect plaintiff, since the work to be performed allegedly involved a peculiar risk of physical harm to others. Restatement of Torts 2d, Section 416; *Van Arsdale* v. *Hollinger* (1968), 68 Cal. 2d 245, 437 P. 2d 508, 66 Cal. Rptr. 20 (En Banc); *Covington & Cincinnati Bridge Co.* v. *Steinbrock* (1898), 61 Ohio St. 215, 55 N. E. 618; *Hawver* v. *Whalen* (1892), 49 Ohio St. 69, 29 N. E. 1049. Though it is true that the Supreme Court of California in *Van Arsdale* found this rule applicable to employees of independent contractors, the Ohio cases cited above do not extend liability this far.

---

contracted diseases associated with asbestos, suit was brought against *manufacturers* of insulation materials for their failure to warn of the dangers involved in handling defendant's product. *Id.* In upholding a jury verdict for the plaintiff, the court emphasized that Texas law imposed strict liability upon a *manufacturer who sells to a user or consumer* a defective product. *Id.* at 1087. As applied to the instant case, plaintiff claims that *Borel* is controlling because Ohio has adopted the Restatement Rule of strict liability. For reasons which are discussed in the accompanying text, this court does not find *Borel* relevant to the inquiry at hand.

The defendant lays great emphasis on the Ohio decisions wherein the courts focus upon the nature of the work to be performed and inquire whether that work involved "inherent hazards." In response to defendant's reliance on Ohio's "inherent hazard" doctrine, plaintiff distinguishes the doctrine and those cases following it on the ground that his own case involves strict liability for abnormally dangerous activity. Because this court has found plaintiff's claims for strict liability to be without merit, a discussion of relevant Ohio law—including the inherent hazard doctrine—is necessary.

This portion of the court's opinion involves application of traditional negligence principles and analysis, specifically the determination of an individual's duty based on his relationship to another individual and the determination of whether that duty has been breached. For purposes of clarity, it is noted here that plaintiff's second theory by which he seeks to impose liability on defendant is characterized as "defendant's own negligence"; this contention, however, will be addressed separately.

The specific issue in this case is whether defendant O-I is liable to plaintiff St. Julian for injuries allegedly caused by the condition of defendant's premises while plaintiff was working thereon. Among the questions to be answered are the following: What was the relationship between plaintiff and defendant at the time of the alleged incident? What duty, if any, does the law impose on the defendant by virtue of defendant's relationship with plaintiff?

While plaintiff does not address the precise issue of the relationship between plaintiff and defendant, plaintiff alleges in his statement of facts that the defendant "never relinquished possession or control of its plant or premises." Further, plaintiff claims that "[p]erhaps significantly, the defendant by its contract retained the right to prescribe all safety rules and regulations governing the contractor's employee. Construing the evidence in the light most favorable to the plaintiff, it is assumed by the court that plaintiff is presenting the argument that plaintiff was not an independent contractor working on the premises of an own-

er. The converse of this position is the claim that plaintiff was an employee or servant of defendant and that defendant's duty to plaintiff must be based on that employer-employee or master-servant relationship.

On the other hand, defendant argues that plaintiff was an employee of an independent contractor because defendant, as the owner, exercised no control over the mode and manner in which Lathrop (the contractor) and Auburndale performed their work. Defendant notes, for example,

"With respect to Auburndale's work on the project, O-I would tell Auburndale when specific items of equipment were to be disassembled and moved. Once this was done Auburndale's employees would move into the area and disassemble and move the equipment. O-I was only interested in the end result and did not direct the employees of Auburndale in the manner and means of disassembling and moving the equipment. This was done solely by Auburndale."

The foregoing presents this court with two questions: (1) By what standard or test is the determination made concerning the proper characterization of an individual as an employee or independent contractor?; and (2) Applying that standard, does there exist a genuine issue of material fact or, in the alternative, could reasonable minds reach but one conclusion as to the proper characterization? With respect to the first question, the test to be applied is set forth in *Gillum* v. *Industrial Commission* (1943), 141 Ohio St. 373, 48 N. E. 2d 234. There, the court held:

"Whether one is an independent contractor or in service depends on the facts of each case. The principal test applied to determine the character of the arrangement is that if the employer reserves the right to control the manner or means of doing work, the relation created is that of master and servant, while if the manner and means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created." *Id.* paragraph No. 2 of the syllabus.

Numerous courts have considered the issue of the rela-

tionship between parties under strikingly similar facts. For example, in *Tedesco* v. *Cincinnati Gas & Elec. Co.* (C. A. 6, 1971), 448 F. 2d 332, certiorari denied, 405 U. S. 923, 92 S. Ct. 961, 30 L. Ed. 2d 794 (1972), the plaintiff, an employee of an independent contractor, was injured while working on defendant-owner's premises. Plaintiff sought to show that defendant had not relinquished control over the work because defendant not only supplied the specifications, materials and equipment, but also regularly inspected the work being performed. *Id.* at 337. The Sixth Circuit Court of Appeals, in applying Ohio law, held that these facts failed to establish control, and thus the relationship of the plaintiff to the owner was that of an independent contractor and not an employee. *Id.*

Similarly, in *Kelly* v. *Ford Motor Co.* (1957), 104 Ohio App. 185, 139 N. E. 2d 99, the defendant owner retained, *inter alia*, rights to coordinate work schedules, to determine quality or fitness of materials, to consent prior to the subletting or assignment of any work under the contract, to keep a superintendent on the work site, and to specify all work requirements. *Id.* at 190. Rejecting plaintiff's contention that reservation of these rights was tantamount to the desired "retention of control," the court in *Kelly* explained:

"The cited provisions of the contracts are, it seems to us, recognized rights which the owner may reserve without thereby becoming subject to liability for the negligence of a general contractor, or of subcontractors. * * * Furthermore, we find nothing in these provisions which gives to the owner the authority to direct the details of the work or which thrusts upon him responsibility for an injury resulting from the negligent manner in which the details of the work are carried out by an independent contractor." *Id.*, at 191.

The owner in *Kelly*, therefore, was merely the employer of the independent contractors; by contrast, a contractor was defined as one "who furnishes labor and materials and directs and supervises the details and manner of doing the work." *Id.*

Also instructive on this issue of control is *Sullivan* v.

*General Elec Co.* (C. A. 6, 1955), 226 F. 2d 290. In that case, plaintiff was deemed to be an independent contractor, despite the fact that the employer reserved the right of supervision or inspection of the work during its performance. *Id.* at 291. The key factor, as in *Tedesco, supra,* and *Kelly, supra,* was the control exercised by the independent contractor over the mode and means of performance. *Cf. Parsons* v. *Blount Bros. Constr. Co.* (C. A. 6, 1960), 281 F. 2d 414, 416 (defendant, who was general contractor, controlled mode and manner of plaintiff's work where defendant "was actively engaged in work thereon").

In the instant case, plaintiff asserts that control was never relinquished because:

"[p]ursuant to its contract with Lathrop, the defendant all [*sic*] authority and control necessary 'to assure the proper execution of the work.' (page 00.50-3) The contract specified that the work to be performed was to be completed as directed by the owner. Lathrop was to perform the work to the reasonable satisfaction and direction of the defendant owner's representative. (page 1) Owens-Illinois retained the right to order extra work, cancel any or all parts of the work not yet performed and to make changes by altering, adding to or deducting from the work. (page 2) The contract states that any differences as to the *manner* of performance of work shall be 'determined by the owners [*sic*] representative. (page 3) The contract further required Lathrop to keep on the site a superintendent and any necessary assistants satisfactory to the defendant. Any superintendent or any other employee of Lathrop 'shall be removed on demand of the owner * * *.' (page 00.50-8 and 9) Why did the defendant owner retain the right to aprove [*sic*] and fire the contractor's superintendent? Because *'all directions* given to him shall be as binding as if given to the contractor.' (page 00.50-9)

"The defendant never relinquished possession or control of its plant or premises. The contract contemplated that the work by Lathrop or its subcontractors in the old plant was to be carried on simultaneously with the existing plant production. (page 15-19.2) The defendant owner retained the power to confine the use of the premises by the

contractor's workmen to the limits it set. (page 15-9.2) To underscore this end the contract required that the contractor's employees refrain from interferring with production activities. (page 00.10-4)."

But these facts present nothing more to establish retained control than did the facts in *Kelly, supra*. Plaintiff's further allegation, that defendant "retained the right to prescribe all safety rules and regulations governing the contractor's employees," is also insufficient to establish control. As noted by the Sixth District Court of Appeals in *Cuppy* v. *Lathrop*, C. A. No. L-75-170 (April 16, 1976):

"(b)efore it can be said that Owens-Illinois and Lathrop agreed to exercise direct control over Romanoff with respect to the day to day safety supervision of the contract * * * such agreement must clearly appear from the terms of the agreement, the conduct of the parties or the nature of the work being performed." *Id.* at 17 (citations omitted).

In light of the controlling case law in Ohio, it is the conclusion of this court that reasonable minds could not differ in finding that the defendant did not retain the right to control the details and manner of the work to be performed. As a result, the relationship of plaintiff St. Julian to defendant Owens-Illinois was that of an independent contractor's employee[3] to an owner, and the status of plaintiff while working in this capacity on defendant's premises was that of an "invitee." *Davis* v. *Charles Shutrump & Sons Co.* (1942), 140 Ohio St. 89, 42 N. E. 2d 663, paragraph No. 1 of the syllabus; *Hozian* v. *Crucible Steel Casting Co.* (1937), 132 Ohio St. 453, 9 N. E. 2d 143, paragraph No. 3 of the syllabus; see, also, *Debie* v. *Cochran Pharmacy-Berwick, Inc.* (1967), 11 Ohio St. 2d 38, 227 N. E. 2d 603.

Based on this relationship, the question thus arising may be stated as follows: What is the duty owed by the

---

[3]Technically speaking, plaintiff was the employee of the subcontractor, Auburndale. The duty that flows from the defendant to the plaintiff, however, is unaffected by the title "subcontractor's employee" as opposed to "independent contractor's employee"; the determinative factor, as already noted, is whether the defendant exercised control over the mode and manner of the work to be performed. *Gillum* v. *Industrial Comm., supra.*

owner of property to an invitee? As a general rule, it may be said that the owner owes an invitee the duty of ordinary care. *Schwarz* v. *General Elec. Realty Corp.* (1955), 163 Ohio St. 354, 126 N. E. 2d 906, paragraph No. 1 of the syllabus. But this general rule is subject to the "inherent hazard" exception, relied upon by defendant herein. *Schwarz, supra.* Before determining the applicability of this exception to the case at hand, two distinct doctrines must be distinguished: the inherently dangerous work doctrine, and the doctrine of inherent hazard.

The first doctrine, inherently dangerous work, is generally invoked to impose liability on the owner of premises for injury to *third persons* caused by an independent contractor. See, *e. g., Covington & Cincinnati Bridge Co.* v. *Steinbrock, supra; Hawver* v. *Whalen, supra.* While plaintiff seeks to utilize this theory to impose liability on defendant for plaintiff's alleged injuries, the Court of Appeals for the Sixth District has expressly held that the doctrine is inapplicable to employees of independent contractors. *Cuppy, supra,* at 18. Rather, this theory of liability is based on the rationale that an owner has certain non-delegable duties *to the public* when it employs another to do work that is deemed inherently dangerous. See, *e. g., Covington & Cincinnati Bridge Co.* v. *Steinbrock, supra; Hawver* v. *Whalen, supra.*

By contrast, the doctrine of inherent hazard limits the right of an independent contractor's employee to recover from the owner for injuries sustained while performing work that involves elements of danger. *Schwarz, supra; Cuppy, supra,* at 19. Thus, when the very work to be performed and for which the independent contractor's employee is paid involves hazards, the duty of the owner to the employee is severely limited. As explained by the Ohio Supreme Court in *Wellman* v. *East Ohio Gas Co.* (1953), 160 Ohio St. 103, 113 N. E. 2d 629:

"[W]here an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches

to the one who engaged the services of the independent contractor." *Id.*, paragraph No. 1 of the syllabus.[4]

Accordingly, the question arises whether the hazard of solder glass dust was inherent in the work to be performed, and whether plaintiff knew and appreciated the danger therein. In reaching the conclusion that the work which plaintiff was employed to perform involved an inherent hazard, this court finds it significant that plaintiff, for purposes of its strict liability argument, forcefully maintained that the work to be performed by plaintiff was inherently dangerous. Moreover, the defendant and its general contractor, as well as the employees of the independent contractor and subcontractor, contracted with reference to the safety requirements necessary in this work.[5] (One of the primary reasons Auburndale was asked to bid on this project was that Auburndale had moved the same equipment into plant No. 29 several years before and was aware of the hazards resulting from the disassembling and moving of such equipment. Before entering into the subcontract agreement the affiant and Auburndale employees knew that the equipment to be disassembled and removed from Owens-Illinois, Inc.'s plant No. 29 was covered with solder glass dust and that safety measures would have to be taken to avoid hazards pertaining to solder glass dust.)

Since the work to be performed involved an inherent hazard, this court must now inquire whether reasonable minds could differ in determining if plaintiff knew and appreciated the danger of the work. According to the law as set forth in *Wellman, supra,* it is only when the employee lacks this knowledge that the law imposes upon the owner the duty to warn an invitee of the hazard.

---

[4]Though the earlier decision of *Bosjnak* v. *Superior Sheet Steel Corp.* (1945), 145 Ohio St. 538, 62 N. E. 2d 305, had indicated that a broader duty might exist, the court in *Schwarz, supra,* acknowledged that *Wellman, supra,* in fact limited the holding of *Bosjnak.* See, e. g., *Ford Motor Co.* v. *Tomlinson* (C. A. 6, 1956), 229 F. 2d 873, certiorari denied, 352 U. S. 826, 77 S. Ct. 38, 1 L. Ed. 2d 49 (1956); see, also, *King* v. *Morrison Freight Lines* (1959), 111 Ohio App. 172, 171 N. E. 2d 173.

[5]*See* footnote No. 1, *supra,* and accompanying text.

Though plaintiff admits that it requested to "wash down" the equipment, plaintiff denies that he had personal knowledge of the "severe" hazard involved. However, from the facts as previously explained, there is no question that plaintiff's employer—Auburndale—had this knowledge. Thus, on the issue of knowledge, the case at bar is factually indistinguishable from *Evans* v. *Whirlpool Corp.* (1967), 10 Ohio St. 2d 240, 227 N. E. 2d 208 (*per curiam*).

In *Evans,* the plaintiff was an employee of the city of Marion, and was injured while working for the city in its salvage operations. 10 Ohio St. 2d at 240. The defendant had deposited dangerous waste materials with the consent of the city, and plaintiff after handling the materials suffered total blindness in one eye. *Id.* Plaintiff sought to recover from defendant on three theories: (1) that defendant knew or should have known that the waste material deposited was inherently dangerous; (2) that defendant negligently failed to clean and remove the dangerous substance; and (3) that defendant negligently failed to warn the defendant of the dangerous character of the waste materials. *Id.*

The Ohio Supreme Court, in affirming the directed verdict for the defendant, explained that:

"When the city accepted these waste materials from defendant with actual notice of their character, it undertook to dispose of them and thus became, as to the defendant, an independent contractor." 10 Ohio St. 2d at 241.

The court then applied *Wellman, supra,* and was satisfied that the city was aware of the inherent hazard. The reasoning of the court in *Evans* is equally compelling here.

Thus, the knowledge of the danger conveyed by the owner to the employer is sufficient compliance with the owner's duty to warn under *Wellman.* As applied to the facts of the present case, it is irrelevant whether or not plaintiff had actual knowledge of the severity of the dangers, and no liability can be imposed on the defendant for breach of the duty to warn an invitee of inherent dangers.

While the foregoing disposes of any argument that defendant breached a duty owed to the plaintiff under a

traditional negligence theory, plaintiff's second theory of recovery is entitled "defendant's own negligence." Here, plaintiff alleges that defendant violated 1967 Ohio Safety Requirements under "IC regulation 5-11," regarding ventilation and exhaust equipment in workshops and factories. No citation is provided, however, as authority to demonstrate the applicability of these rules to anyone other than an "employer." This court has uncovered only the presently controlling regulations under Chapter 4121:1-5 Ohio Adm. Code, which address these problems in workshops and factories.[6] The introductory section there indicates that

"The specific requirements of this code are requirements upon an employer for the protection of such employer's employees and no others and apply to all workshops and factories subject to the Workers' Compensation Act. (R. C. 4123.01 to 4123.99)."

Because plaintiff has failed to provide authority which would allow this court to find the stautory duty applicable to one other than "employer," no duty based on this regulation can be imposed on the defendant herein.

Further, plaintiff alleges that "the defendant itself assumed the duty of providing respirators." It is plaintiff's contention that these respirators were inadequate and that "[i]t has long been the law in Ohio that an owner is responsible for injury to the employee of a contractor because of the furnishing of defective and inadequate equipment." In support thereof, plaintiff refers this Court to the "cases collected at 28 Ohio Jur. 2d 380, Section 33 and supplement." Upon careful examination, however, it appears that the section cited by plaintiff is contrary to plaintiff's position.

Significantly, the text therein disinguishes those situations where an employer *permits* the independent contractor to use the employer's tools from those cases where the employer has *agreed* to keep an appliance in repair:

"If the employer permits the contractor to use the

___

[6] *See* 5 Ohio Administrative Code at 250 (Rule Number Conversion Table).

employer's tools and appliances, the employer is not, in the absence of his agreement to do so, required to keep them in repair, and is not liable for injuries caused by their becoming out of repair. In such a case the employer's only obligation in reference to tools or appliances supplied is to exercise due care not to let the contractor have an appliance which is a nuisance, or defective, or likely to cause injury to third persons. * * * Where the employer has agreed to keep the appliance in repair, a writ of action has been held to accrue to a servant of the independent contractor who was injured by failure of the employer to comply with the contract." 28 Ohio Jurisprudence 2d 381, Independent Contractors, Section 33 (1958).

Applying the foregoing to the facts of the case *sub judice*, it is irrelevant whether plaintiff could prove that the respirators were defective, for plaintiff has failed to present facts which would support a duty owed by defendant to plaintiff to repair or to maintain the respirators.

In similar fashion, plaintiff contends that the defendant was negligent in failing to provide for plaintiff not only the use of its shower facilities but also the services of monthly blood level tests. Without explanation, plaintiff raises the allegation of negligence because the defendant provided these measures for "its own employees." Yet, as was noted with respect to the respirators, plaintiff has failed to establish that defendant had a *duty* to provide the employee of an independent contractor with these services.

Plaintiff's next basis for his allegations that defendant was negligent is his claim that the defendant had a duty to plaintiff "to guard [him] against danger and [to] exercise ordinary care to maintain the premises in a reasonably safe condition for the work to be performed," *i. e.*, to provide a reasonably safe place to work. This question has been answered by the court, by the determination, first, that the defendant did not retain control over the manner or means of doing work, and, second, that defendant's duty to plaintiff as an invitee was severely limited where the very work to be performed involved elements

of danger. See, *e. g., Wellman, supra*; see, also, *Cuppy, supra.*

Another duty which plaintiff alleges was owed to plaintiff is characterized as "the common law duty to provide necessary safety equipment." The authority cited in support is a Michigan case, *Funk* v. *General Motors Corp.,* (1974), 392 Mich. 91, 220 N. W. 2d 641; there, however, the court specifically noted that "[s]upervising job safety, providing safeguards, is not part of the business of the typical owner." 220 N. W. 2d at 646. In light of the court's earlier discussion regarding defendant's duty after providing respirators, further analysis is unnecessary here; plaintiff's contention, therefore, is without merit.

Plaintiff's third and final basis for imposing liability on the defendant is captioned "violation of statute or safety regulation." Here, plaintiff reiterates his contention, previously raised and rejected, that defendant violated "at least two Ohio Safety Regulations." In addition, plaintiff maintains that defendant violated R. C. 3719.-30 relating to poisonous substances. This section provides:

"No person shall leave or deposit poison or a substance containing poison in a common, street, alley, lane, or thoroughfare, or a 'yard or enclosure occupied by another.

"Whoever violates this section shall be liable to the person injured for all damages sustained thereby."

While the parties have argued the meaning of "occupier" as used in this section, it is the opinion of this court that the section is wholly inapplicable to the case at hand.

First, it is significant to note that enforcement of this section is granted to the Board of Pharmacy under R. C. Section 3719.36. It is, at a minimum, incongruous that the Board of Pharmacy would be called upon to evaluate the conditions in a workshop or factory, where the state of Ohio has delegated that duty to the Ohio Industrial Commission. Second, the decisions in which this section has been interpreted demonstrate its application to, *e. g.,* the

use of poison. as an insecticide, see, *e. g.*, 1955 Ohio Atty. Genl. Ops. No. 5839 at 521; dealers in insecticides, 1928 Ohio Atty. Genl. Ops. No. 2973 at 2770; or the promiscuous use of poisons, see 1973 Ohio Atty. Genl. Ops. No. 73-096; 1955 Ohio Atty. Genl. Ops. No. 5839 at 521. Third and finally, no sound reason has been presented to this court which would support the application of R. C. 3719.30 to facts such as those in the instant case where there is no indication that any court has ruled in favor of plaintiff's contention on this issue in the more than 100 year history of this statute.[7]

Therefore, in light of the foregoing facts and applicable law, it is the opinion of this court that there is no genuine issue of material facts; rather, it is clear from the pleadings, briefs of counsel, affidavits and sworn statements filed herein that plaintiff St. Julian's status as an employee of an independent contractor, coupled with the existence of solder glass dust as an inherent hazard in the work to be performed by plaintiff, preclude recovery by plaintiff in this case and the defendant is entitled to judgment as a matter of law. Thus, under the law of Ohio, the defendant's motion for summary judgment is well taken and is hereby granted.

*Case dismissed.*

---

[7] It is interesting to note that, in 1895, the Circuit Court of Greene County was presented with a question analogous to the case at bar. *Ferguson* v. *Miami Powder Co.* (1895), 6 C. D. 408, 9 C. C. 445. There, plaintiff's cattle escaped from plaintiff's enclosed property and wandered onto the unenclosed property of defendant where the cattle consumed poisonous refuse left as a result of defendant's corporate activities. 6 C. D. at 408. Plaintiff then brought suit for damages relying on an earlier version of the poisonous substance statute. Because the court determined that the defendant's unenclosed property did not constitute a "commons" within the language of the statute, the court found it unnecessary to consider whether the statute "would apply to a case in which the depositing of the poison resulted from the ordinary operation of a lawful business." *Id.* at 412. This court is of the opinion that the determination of the inapplicability of the poisonous substance statute to the facts of the case at bar eliminates the necessity of engaging in an analysis of the definition of "occupier."